RECEIVED
IN LAKE CHARLES, LA
JUN - 7 2007
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| VIRGIN OFFSHORE U.S.A., INC. | : | DOCKET NO. 04 CV 740 |
| | : | JUDGE MINALDI |
| TEXAS CREWBOATS, INC., ET AL. | : | MAGISTRATE JUDGE WILSON |

## OPINION

This matter arises out of the March 22, 2004 allision of the M/V Jacqueline with a single pile well caisson located in West Cameron Block 41 in the Gulf of Mexico. On March 26, 2004, Virgin Offshore U.S.A., Inc. ("Virgin") filed suit alleging that Texas Crewboats, Inc. ("Texas Crewboats") was at fault for the allision and seeking to recover damages to the caisson. Texas Crewboats counterclaimed, seeking to recover for damage to the M/V Jacqueline. A bench trial was held on March 26, 2007.

Having considered the evidence and testimony adduced at trial, the record, the memoranda of counsel and the law, the court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. The M/V Jacqueline is a 116.5 foot crewboat, owned and operated by Texas Crewboats.

2. The Jacqueline was equipped with two radars and a GPS. There was no evidence that any of the navigation equipment was inoperable or malfunctioning.

3. At approximately 3:15 a.m. on March 22, 2004 the M/V Jacqueline set out from the Calcasieu

River Basin to a rig located in West Cameron Block 295. The night was clear and dark, with no moon out. The seas were choppy and visibility was about 10 to 12 nautical miles.

4. There were four crewmen and one passenger aboard the Jaqueline. Second Captain Coy Smith was at the helm and crewman Tom Curran, who was on watch with Smith, was making coffee in the galley. Captain Jon Falschlehner, another crewman, and the passenger were asleep below deck.

5. At about 4:00 a.m., traveling at a speed of approximately 21 knots, the Jacqueline allided with single pile well caisson, owned[1] and operated by Virgin.

6. Tom Curran and the passenger sustained minor injuries.

7. The allision caused $85,335.89 in damage to the Jacqueline.

8. The allision caused damage to the caisson, requiring, among other things, the replacement of the navigation aid skid.

9. The caisson did not have operational lights at the time of the allision. This finding is based upon the testimony of the Jacqueline's two captains and three other ship captains – all of whom viewed the caisson while transiting the Gulf of Mexico.

    a. Captain Jon Falschlehner, who was a captain aboard the Jacqueline when it allided with the well caisson, testified that on two occasions he saw the caisson at night and both times it was unlit. Captain Falschlehner also testified that, after the Jacqueline allided with the

---

[1] At trial, Robert Smith, President of Virgin, testified that Virgin has an 88.5 percent ownership interest in the well.

caisson, he came up to the wheelhouse and did not see any lights on the caisson.

b. Captain Smith, the only eyewitness to the allision, testified that he did not see the caisson until it was about 20 feet in front of him, at which point he tried unsuccessfully to avoid it.

c. Three ship captains employed by Seacor Marine, a company with no apparent interest in this litigation, also testified that the well caisson was unlit prior to the allision. Captain John Rogers testified that he passed the caisson at least ten times in March 2004 and never saw it illuminated. Captain Huey Eaves testified that from January 2004 to March 22, 2004, when he transited past the caisson, he never saw it lit. Captain Eaves also testified that he discussed the fact that the caisson was unlit with the other captains aboard his vessel. One of those captains, Martin Songer, sent an email to Seacor notifying it that the caisson was a hazard to navigation.[2] That email, sent on January 31, 2004, states:

> THEIR [sic] IS A SINGLE WELL STRUCTURE (CANDLE STICK)
> ABOUT 4.5 MILE SOUTH WEST OF THE CAMERON JETTIES
> AT POSITION (29.39.7 - 093.24.2)
> IT HAS NO LIGHT OR HORN THAT YOU HERE [sic]. SHOWS
> ON RADAR WELL ON A GOOD DAY
> UNKNOWN WHAT OIL COMPANY IT BELONGS TOO [sic].[3]

Although Captain Songer explained that the only day he could be certain the caisson's lights were out was the day he sent the email to Seacor headquarters, his email and testimony corroborate the other captains' testimony.

---

[2] *See* Pl.'s Ex. 31 (Eaves Depo. Ex. 1).

[3] *Id.*

3

10. At the time of the allision Captain Smith had held a 100 ton Master's License for five years and worked aboard the Jacqueline for about five years. Prior to the March 22, 2004, Captain Smith had never been involved in an allision or collision.

11. Texas Crewboats required its employees to attend a two-day safety class and familiarize themselves with the Texas Crewboats Safety Environmental and Accident Prevention Programs. Captains Falschlehner and Smith attended the safety class and were familiar with the safety manual. Both captains also conducted weekly safety meetings with the crew of the Jacqueline. A log was kept of these meetings.

12. At the time of the allision, the Jacqueline was traveling at a prudent speed in light of the weather and sea conditions.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over this action under the general admiralty and maritime laws of the United States because it involves a vessel allision on navigable waters.

2. Venue is proper in the Western District of Louisiana.

3. Maritime collision liability is based upon fault. *The Java*, 81 U.S. (14 Wall) 189 (1871).

4. There is a presumption of fault against a moving vessel that allides with a visible[4] stationary

---

[4] *Delta Transload, Inc. v. M/V Navios Commander*, 818 F.2d 445, 450 (5th Cir. 1987) ("First, the presumption of negligence has previously been invoked only against moving vessels which damaged wharves, moored vessels, and other stationary, visible objects. We do not think that the presumption should apply to allisions with sunken and hidden objects.").

object. *The Oregon*, 158 U.S. 186, 197, 15 S.Ct. 804, 809 (1895). This presumption derives from the commonsense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way. *American Petrofina Pipeline Co. v. M/V Shoko Maru*, 837 F.2d 1324, 1326 (5th Cir. 1988) (citations omitted). "This presumption operates to shift the burden of proof-both the burden of producing evidence and the burden of persuasion-onto the moving ship." *Id.* The burden is heavily upon the vessel asserting such a defense. *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir. 1967).

5. The moving vessel may rebut the presumption by showing, by a preponderance of the evidence, that the collision was (1) the fault of the stationary object, (2) that the moving ship acted with reasonable care, or (3) that the collision was an unavoidable accident. *Id.* (citing *Bunge Corp. v. M/V Furness* Bridge, 558 F.2d 790, 795 (5th Cir.1977), *cert. denied* 435 U.S. 924, 98 S.Ct. 1488 (1978) and others).

6. With regard to the fault of stationary objects, an obstruction to navigation must be maintained and operated so as not to impede navigation any more than is absolutely necessary– the right of navigation being paramount. *Santa Rosa Island Authority v. F. Rust Smith & Sons, Inc.*, 303 F.2d 576, 580 (5th Cir. 1962). Additionally, the general rule presuming fault of the moving vessel does not apply where the stationary vessel was also guilty of a statutory violation (i.e. a failure to have operational light and noise warning systems). *See Alamo Barge Line, Inc. v. Rim Maritime Co., Ltd.*, 596 F.Supp 1026, 1033 (E.D.La. 1984).

7. *The Pennsylvania* rule applies where a vessel or stationary structure[5] violates a statutory duty or Rule of the Road. *The Pennsylvania*, 86 U.S. (19 Wall.) 125 (1873). Under the rule, "where a vessel has committed a positive breach of statute she must show not only that probably her fault did not contribute to the disaster, but that certainly it did not; that it could not have done so." *Id.* at 126.

8. However, it has long been recognized in this circuit that "*The Pennsylvania* did not intend to establish a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable, or remote." *In re Mid-South Towing Co.*, 418 F.3d 526, 534 (5th Cir. 2005) (quoting *Compania De Maderas De Caibarien v. The Queenston Heights*, 220 F.2d 120, 122-23 (5th Cir. 1955)).

9. Because the well caisson did not have operational lights at the time of the allision, the presumption of fault against the M/V Jacqueline, as the moving vessel, does not apply. The failure to have operable lights on a fixed structure constitutes a statutory violation. 33 C.F.R. § 67.01-1, *et seq.* Thus, the rule of *The Pennsylvania* applies and Virgin bears the burden of proving that the violation did not cause or contribute to the allision.

10. Virgin, however, is unable to carry this burden, as the failure to have operable lights on the caisson was the sole proximate cause of the allision.

---

[5] *Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991) ("Although in its original form the rule of *The Pennsylvania* applied only to collisions between ships, it has been extended in this Circuit to apply to a variety of maritime accidents and to parties other than vessels.")

11. The court finds no fault on the part of Texas Crewboats. The Jacqueline was not shown to have been unseaworthy at the time of the allision. Neither was it proved by a preponderance of the evidence that Captain Coy Smith breached his duty to act as a reasonably prudent mariner or violated a statute or rule of navigation.[6]

## AMOUNT OF RECOVERY

1. In admiralty cases, the award of prejudgment interest from the date of loss is the rule rather than the exception. Discretion to deny interest must be based on the existence of peculiar circumstances. *Complaint of M/V Vulcan*, 553 F.2d 489, 490-91 (5th Cir. 1977).

2. The court finds no peculiar circumstances warranting a denial of prejudgment interest.

3. As against Virgin, the court will enter judgment for Texas Crewboats in the amount of $85,335.89 for damage to the Jacqueline, plus interest at a rate of 4.96% per annum from March 22, 2004, the date of the loss.

---

[6] At trial, the issue was raised whether it was appropriate for Captain Smith to have been the sole lookout at the time of the allision. Rule 5 of the International Rules (COLREGS), reproduced in the Coast Guard Commandant Instruction (COMDTINST) M16672.2D, *available* at http://www.uscg.mil/vtm/navrules/navrules.pdf, states:
> Every vessel shall at all time maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

The Fifth Circuit has held, "The question of a proper lookout is one of fact to be determined from all of the circumstances on the basis of common prudence, there being no fixed requirement that a vessel maintain a 'bow lookout' under the facts and circumstances here presented." *China Union Lines, Ltd. v. A.O. Anderson & Co.*, 364 F.2d 769, 783 (5th Cir. 1966), *cert. denied*, 386 U.S. 933, 87 S.Ct. 955 (1967).

In the present case, taking into account the circumstances, it was not improper for Captain Smith to be the sole lookout nor was it imprudent for him to allow Tom Curran to go below deck to make coffee.

4. Texas Crewboats's costs in this action shall be taxed against Virgin as the party solely at fault.

## CONCLUSION

For the reasons set forth herein, the court finds that Texas Crewboats, by a preponderance of the evidence, has proven that Virgin's failure to have operable lights aboard its caisson was the sole proximate cause of the allision at issue. Texas Crewboats's counterclaim will be granted in the amount of $85,335.89, plus legal interest from the date of its loss.

Accordingly, let there be judgment entered consistent with the opinion herein.

Lake Charles, Louisiana, this 29 day of May, 2007.

PATRICIA MINALDI
UNITED STATES DISTRICT COURT